UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:07-HC-2015-BR

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHNNY ALLEN HASS | RESPONDENT'S PROPOSED<br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

Comes now the respondent, Johnny Hass, by and through undersigned counsel, and respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

I.  **INTRODUCTION**

Petitioner, the United States of America ("the government") instituted this civil action on January 10, 2007, seeking to commit Johnny Hass ("Mr. Hass" or "respondent") as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("the Act"). 18 U.S.C. § 4248. Docket Entry ("DE") 1. The government filed a certificate stating that mental health personnel for the Federal Bureau of Prisons ("BOP") examined respondent and issued a preliminary determination that he is sexually dangerous within the meaning of the Act. A certificate filed under the Act stays respondent's release from federal custody pending a hearing to determine whether respondent qualifies for commitment as a sexually dangerous person. The government's petition was filed one day prior to respondent's scheduled date of release from the BOP custody on January 11, 2007. *See id.*

1

An evidentiary hearing and bench trial is scheduled in this case before the Senior District Judge W. Earl Britt on January 234, 2012. After considering the testimony at the evidentiary hearing, the evidentiary record, and the parties' submissions, this Court concludes that the government has failed to establish by clear and convincing evidence that respondent is sexually dangerous to others as required by the Act.

## II.   FACTS

1. Mr. Hass was born in 1968 and was forty-three years of age at the time of his evidentiary hearing.

2. At the time of his hearing, Mr. Hass had been incarcerated for more than five (5) years after his release date.

3. Mr. Hass's release date from the BOP was January 11, 2007. (DE 1).

### A.   Personal History

4. Johnny Hass was born in Miami, Florida and is the oldest of two children. He does not remember his father, who left the family when Johnny was about three or four years old.

5. His mother married his stepfather when Johnny Hass was approximately ten (10) years old. Johnny Hass's stepfather was an alcoholic, was physically abusive toward his mother, and verbally abusive toward Johnny.

6. In 1981, when he was thirteen years old, Johnny Hass suffered a traumatic brain injury. Johnny and his friends rode their bicycles onto a ramp and jumped into a man-made lake.

7. The pedal from another bicycle struck Johnny's head, shattered his skull and punctured his brain.

8. Johnny underwent surgery that lasted about ten hours and he was hospitalized for seven days. He was given Dilatent to control potential seizures. He was readmitted for four days in 1982 for surgical installation of a plate to close the opening in his skull.

9. Johnny Hass was home schooled for one year after his injury. He earned his GED in 1985.

10. Between 1990 and 1995, Mr. Hass was employed by various employers, primarily pizza delivery and car care services. He operated a minor car repair service from his home in 1992 and 1993.

11. During 1995, he was employed by Jiffy Lube and Quick 10 Oil Change Center as a lubrication technician. Mr. Hass was working as a delivery driver for Steak Out Charbroiled Delivery when he was arrested in 1995.

12. After his release from prison in 1997, he worked as a lubrication technician for Jiffy Lube where he was promoted to the position of assistant manager. Mr. Hass held this position at the time of his arrest for the instant offense.

13. Mr. Hass was married to Sharon Jenkins Hass from 1991 to 1997. (Rep_Hass_000014). Mr. Hass and Sharon had two children, a son and daughter. Their daughter died in September, 1992, just two months after she was born from sudden infant death syndrome (SIDS). Their son was born in 1994. When he was three months old he was treated at a hospital for suspected physical abuse and both parents were referred for parenting classes by the Mecklenberg Department of Social Services.

14. Mr. Hass has never been diagnosed with alcohol or drug dependence.

## B. Criminal and Sexual Offense History

15. In 1982, when he was 14 years old, Johnny Hass sexually assaulted a nine year old girl. He pled guilty to attempted sexual battery and was sentenced to a juvenile program at Human Rehabilitative Services Environmental Institute (HRSEI) in Fort Lauderdale, Florida. He completed the program on July 25, 1985.

16. On November 4, 1987, when he was 19 years old, Johnny Hass pled no contest to attempted lewd assault upon a child and aggravated assault of his former girlfriend in the Circuit Court, Ninth Judicial Circuit, Orange County, Florida. (Case Nos. CR-87-718; CR-874892). He was sentenced to thirteen months on each count, to be served concurrently.

17. On October 1, 1996, Mr. Hass was convicted of interstate transportation of child pornography via computer in the United States District Court for the Western District of North Carolina for conduct that dated back to May, 1995. He had agreed to distribute child pornography to an undercover FBI agent and he possessed child pornography. He was sentenced to twenty-six months in prison, to be followed by three years of supervised release. He was released to supervision on September 26, 1997.

18. On July 24, 1998, Mr. Hass's supervised release was revoked for conduct that dated back to December, 1997. He had engaged in unsupervised contact with his minor son, had unauthorized contact with other minors, and he possessed child pornography. He was sentenced to 24 months in prison, 11 months of which was to be served consecutively to a second charge related to the possession of child pornography.

19. On September 8, 1998, Mr. Hass was convicted of sexual exploitation of minors in the United States District Court for the Western District of North Carolina for the child pornography

he possessed while on supervision in December, 1997. He was sentenced to 85 months in prison, to be followed by 5 years of supervised release. He supervised release began on December 30, 2004.

20. On January 11, 2006, a United States probation officer petitioned the United States District Court for the Western District of North Carolina for revocation of Mr. Hass's supervised release.

21. On February 16, 2006, Mr. Hass was found to have violated his supervised release because he possessed pornographic or sexually explicit material and he used a computer which had the capacity to be connected to a computer network, without approval of his probation officer. He also failed to report to his probation officer as required and left the area without his probation officer's permission. He was sentenced to twelve months in prison, to be followed by 4 years of supervised release.

## C. Bureau of Prisons Disciplinary History

22. Mr. Hass has just two BOP disciplinary infractions--for possessing an unauthorized item and hitting another inmate.

## D. Sex Offender Treatment

23. Mr. Hass requested treatment while in BOP custody in 2001. However he was never admitted to the program. Mr. Hass participated in community treatment in 2005 for approximately one year prior to being arrested for the instant supervised release violation. He was recommended for sex offender treatment by the sentencing judge upon his revocation of supervised release. Mr. Hass inquired into treatment while in BOP custody in 2006, but was ineligible for the program because his sentence was not the requisite 18 to 24 months for program participation.

### E. Current Status

24. On January 10, 2007, the United States filed the instant action seeking to commit Mr. Hass as a sexually dangerous person under the Adam Walsh Act, 18 U.S.C. § 4248. (DE 1). Pursuant to the statute, the filing of this action stayed his release pending the outcome of the proceedings. Mr. Hass completed his criminal sentence on January 10, 2007 and was scheduled to be released the next day to commence four years of supervised release if the government had not filed the certification pursuant to § 4248. Respondent's § 4248 proceeding was stayed *ab initio* for almost 4 years while the appellate courts analyzed § 4248 constitutionality.

25. If released, Mr. Hass will be on supervised release for a term of 4 years. (Pet_Ex 25). The original conditions of his supervised release include, among others, no unsupervised contact with anyone under the age of eighteen, employment and/or volunteer restrictions to ensure no contact with children under the age of eighteen, registering as a sex offender, periodic unannounced computer inspection and copying of files by his probation officer, prohibition against possession of any sexually explicit pictures, paraphernalia, magazines, video tapes, or similar materials, and/or use of any computer which has the capacity to be connected to any computer network, and reporting to a probation officer as required. (Pet_Ex 15).

### III. EXPERT'S QUALIFICATIONS

26. The government retained Dr. Christopher North as an expert in this case. Dr. North reviewed Mr. Hass's records but did not conduct an interview of Mr. Hass.

27. The government called Dr. M. Lela Demby as an expert in this case. Dr. Demby reviewed Mr. Hass's records but did not conduct a interview of Mr. Hass.

6

28. The court appointed Dr. John Fabian as a respondent-selected examiner in this case. Dr. Fabian reviewed Mr. Hass's records and conducted an interview of Mr. Hass. Dr. Fabian is a Board Certified forensic psychologist and clinical neuropsychologist.

29. The parties did not challenge the qualifications of any of the above experts. The Court having reviewed the curriculum vitae of the experts, finds that each individual is qualified by education and experience to offer expert testimony in this matter.

## IV. LEGAL PRINCIPLES

### A. Standard of Proof and Elements Required to be Established

30. The government has the burden of proving each element by clear and convincing evidence. 18 U.S.C. § 4248(d). "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but by the Due Process clause of the Constitution." *Addington v. Texas*, 441 U.S. 418, 427 (1979). The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." *Id.* at 425. "'Clear and convincing' has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001)(internal quotations and citations omitted). It has alternatively been described "as meaning 'highly probable.'" *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1992) (quoting 9 J. Wigmore, Evidence § 2498 (3d ed. 1940)).

31. To commit respondent, the government must prove by clear and convincing evidence that respondent is a "sexually dangerous person," which the Act defines as "a person who has

7

engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

32. This phrase has not been defined by the statute. The legislative history indicates that it is a direct legislative enactment of the principle of volitional impairment enunciated in *Kansas v. Hendricks*, 521 U.S. 346 (1997) and *Kansas v. Crane*, 534 U.S. 407 (2002). *See,* H.R. Rep. No. 109-218(I) Section-by-Section Analysis and Discussion § 511. In *Crane*, the Supreme Court stated that the "serious difficulty" requirement is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment, from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another." *Crane*, 413.

33. A finding of dangerousness is also constitutionally required. *Kansas v. Crane*, 534 U.S. 407-409, 410 (stating "we have consistently upheld involuntary commitment statutes . . . [when] (1) the confinement takes place pursuant to proper procedures and evidentiary standards; (2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality'" (*citing Kansas v. Hendricks*, 521 U.S. 346, 357-358; quotations omitted)). *See also Foucha v. Louisana*, 504 U.S. 71, 82-83 (1992).

34. In <u>Kansas v. Crane</u>, <u>supra</u>, the Supreme Court held that in order to civilly commit someone for sexual dangerousness "there must be proof of serious difficulty in controlling behavior." <u>Id</u>. at 413. The Supreme Court noted that this standard allowed courts wide discretion in relying on a number of different factors relevant to sexual dangerousness. The standard did not have "a particularly narrow or technical meaning;" nor was it demonstrable with "mathematical precision." <u>Id</u>.

## V. FINDINGS

### A. Prior Bad Acts

35. Mr. Hass does not contest that he has engaged in or attempted to engage in sexually violent conduct. This Court finds that the government has established this element by clear and convincing evidence in that Mr. Hass was convicted of attempted sexual battery in 1982.

### B. Suffers from a Serious Mental Illness, Abnormality or Disorder

36. All of the experts who have evaluated Mr. Hass are in agreement on an Axis I diagnosis of pedophilia. There is disagreement as to the type of pedophilia attributed to Mr. Hass under the additional Axis I diagnosis. Drs. Fabian and North opine Mr. Hass is sexually attracted to females (Resp_Ex 1; Pet_Ex 30). Dr. Demby opines Mr. Hass is sexually attracted to males and females (Pet_Ex 29). There is also disagreement as to additional diagnoses. Drs. Fabian and North defer the Axis II diagnosis Resp_Ex_1; Pet_Ex 30). Dr. Demby diagnosed the Axis II condition of Antisocial Personality Disorder (Pet_Ex 29). However, Dr. Demby did not indicate that a diagnosis of Antisocial Personality Disorder would qualify as a serious mental illness or disorder for purposes of the Adam Walsh Act in this case. All experts agree to Mr. Hass's Axis III diagnosis of traumatic brain injury and seizure disorder. Since there is no disagreement between the experts that Mr. Hass

9

suffers from pedophilia, and that pedophilia is a serious mental disorder, and since respondent does not contest that diagnosis, the Court finds that the government has established this element by clear and convincing evidence that Mr. Hass suffers from a serious mental illness, namely pedophilia.

### C. Serious Difficulty Refraining from Sexually Violent Conduct or Child Molestation

37. In order to commit Mr. Hass, the government must prove, by clear and convincing evidence, that the disorder results in "serious difficulty refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). As discussed previously, this term implies a volitional impairment.

38. The DSM-IV-TR is clear that the fact that someone has been diagnosed with a mental illness or disorder does not answer the question of whether that person's volition is impaired. The manual states:

> It is precisely because impairments, abilities and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability. The fact that an individual's presentation meets the criteria for DSM diagnoses does not carry any necessary implications regarding the individual's degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is or was unable to control his or her behavior at a particular time.

DSM-IV-TR at page xxxiii.

39. This Court finds that the government has not shown by clear and convincing evidence that Mr. Hass currently presents a serious mental illness, abnormality or disorder that impairs his volitional control such that he would have serious difficulty refraining from sexually violent conduct or child molestation if released.

## VI. DANGEROUSNESS/RISK ASSESSMENT

### A. Introduction

40. All of the experts in this case conducted a risk analysis based on empirical tools and actuarial instruments to evaluate, quantify, and support their dangerousness determinations.

41. No psychological tests or actuarial instruments have been developed that predict with certainty an individual's risk of future sexual offending. The risk instruments are based on group data and provide risk estimates of defined sample groups to which an individual is compared. "The recidivism rates contained in the actuarial tables are the product of the amalgamated risk characteristics of the group and, therefore cannot be ascribed to a particular individual since the risk factors for the individual may vary substantially from that of the group." Theodore Donaldson and Brian Abbott, *Prediction in the Individual Case: An Explanation and Application of its Use with the Static-99R in Sexually Violent Predator Risk Assessments,* American Journal of Forensic Psychology, Volume 29, Issue 1, at 7 (2011). The actuarial instruments provide only group prediction rates on risk of re-offending. The instruments do not provide individual rates of reoffending. *Id.*

42. In evaluating Mr. Hass all of the experts utilized a clinical analysis combined with actuarial instruments and psychological tests to determine if Mr. Hass presents a serious risk of reoffending.

43. Three expert opinions were offered by the parties on the issue of whether Mr. Hass meets the criteria for commitment pursuant to 18 U.S.C. § 4248. Dr. North and Dr. Demby, the government's experts, both opined that Mr. Hass is a sexually dangerous person as defined by the

Act. Dr. Fabian, the respondent-selected expert, opined that Mr. Hass is not a sexually dangerous person and is not at risk of hands-on reoffending if released.

44. For the reasons set forth below, the Court finds that the government has not established by clear and convincing evidence that respondent suffers from a serious mental illness, abnormality or disorder that impairs his volitional control and would result in him having serious difficulty refraining from sexually violent conduct or child molestation, if released.

### B. Expert Opinions

#### 1. Dr. Christopher North

45. Dr. North authored an evaluation and supplemental report dated April 18, 2011 and September 26, 2011. Pet_Ex 30, 31. He opined, based on a review of records, that Mr. Hass meets the criteria as a sexually dangerous person as described in 18 U.S.C. § 4248. *Id.* His opinion appears to be based on an assessment of actuarial instruments. *Id.*

46. In his initial report, dated April 18, 2011, Dr. North opined that Mr. Hass suffers from a serious mental disorder, namely pedophilia, that will cause him serious difficulty in refraining from child molestation if released to the community. Pet. Ex. 30 Dr. North noted that:

> A risk assessment suggests Mr. Hass is more likely that not to be convicted of a new sexual offense if not treated in a custodial environment. While it is true that his last two convictions have involved "hands off" offenses (collection of child pornography), his sexual and general self-regulation are so poor that he would be likely to molest a female child if the opportunity arose. He has admitted that he is a pedophile and his judgment and self-control are sufficiently poor to lead this evaluator to conclude that he is eventually likely to engage in child molestation if not confined and treated in an secure environment.

Pet. Ex. 30 at 1378.

47. In reaching his March 2011 conclusion, Dr. North utilized several actuarial instruments and psychological tests. He used the Static-99 Revised, the Static-2002 Revised, and the Minnesota

12

Sex Offender Screening Tool-Revised (MnSOST-R) actuarial instruments. All of the actuarial instruments placed Mr. Hass in the high risk category.

48. Dr. North noted that these actuarial instruments have moderate predictive accuracy. Pet. Ex. 30 at 1362.

49. When quantifying recidivism rates for individuals who achieved the same score as Mr. Hass on the Static-99R and the Static-2002R, Dr. North opined "in order to evaluate Mr. Hass' absolute recidivism risk, we need to consider the extent to which he resembles the typical member of the routine samples, or if he is more similar to the samples preselected for treatment, the high-risk/high-needs samples or the non-routine samples in general. The exact differences between these four sample types are not fully known but the following features have been identified as characteristics of the four sample types." Pet. Ex. 30 at 1365-1366. He also opined "the reference groups used with the Static-2002R are the same as those used with Static-99R scores. Dr. North used the Structured Risk Assessment-Forensic Version (SRA-FV) "to help determine the norms group to consult in evaluating Mr. Hass' scores on the *Static-99R* and *Static-220R."* Id. at 1366. Using this instrument, Dr. North compared him to a group of offenders with the highest recidivism rates, the "high-risk/high-needs" group. Pet. Ex. 30 at 1368. As noted in Dr. North's report, the Static-99R and Static-2002-R have multiple reference groups for comparison (routine correctional, non-routine correctional, pre-selected for treatment, preselected for risk/need) and evaluators are instructed to select and use the reference group(s) that best fit selection criteria of the individual being evaluated. Pet. Ex. 30 at 1368. Dr. North did not compare Mr. Hass's Static-99R or Static-2002R scores to any other sample groups when listing recidivism rates, noting that use of this sample group is most applicable to Mr. Hass given his total score on the SRA-FV, which is consistent to the high-risk/high-needs norms.

13

Pet. Ex. 30 at 1365. Dr. North noted that individuals with the same scores on as Mr. Hass in the high-risk/high needs group have a risk of 38% in five years and 49% in ten years on the Static-99R and 48% in five years and 59% in ten years on the Static-2002R. Pet. Ex. 30 at 1373. Mr. Hass's score of 10 on the MnSOST-R associated him with a group of individuals 30% of whom had been arrested for reoffense after six years. *Id.*

50. Based on this information, Dr. North opined that Mr. Hass does meet the criteria for sexual dangerous.

### 2. Dr. M. Lela Demby

51. Dr. Demby, a psychologist employed by the BOP, opined based on her review of the records that Mr. Hass suffers from a serious mental illness, abnormality, or disorder, and as a result would have serious difficulty in refraining from sexually violent conduct or child molestation. Pet. Ex. 29 at 1335. Dr. Demby diagnosed Mr. Hass with pedophilia, sexually attracted to both, nonexclusive type, antisocial personality disorder, and seizure disorder, status post brain injury. Pet. Ex 29 at 1325.

52. In assessing Mr. Hass's risk of recidivism Dr. Demby lists three actuarial instruments, the Static-99, the Static-99R, and the Rapid Risk Assessment for Sex Offense Recidivism (RRASOR), that she relied upon in her evaluation. Pet. Ex. 29 at 1328.[1] She also amended the Static-99R to a total score of 6 to take into account that fact that he is now 43 years old. Pet. Ex. 29 at 1329.

---

[1] Dr. Demby noted that she no longer relies on the Static-99 because it has been replaced by the Static-99R nor does she continue to rely on the RRASOR.

53. Lastly Dr. Demby utilized the Sexual Violence Risk-20 (SVR-20) in assessing dynamic factors related to Mr. Hass's risk for future sexual violence. She opined after discussing and rating Mr. Hass on the 20 factors in the SVR-20 that his risk of future sexual violence is high. Pet. Ex. at 1333.

54. Dr. Demby concluded in her report that "Mr. Hass is pedophile and child abuser, whose high scores on the Static-99R, PCL-R and SVR-20 indicate a high probability that his past patterns of sexually abusing children will continue." Pet. Ex. 29 at 1334. She went on to state that "cumulatively, his overall history, criminal record, offense characteristics, lifestyle choices, personality patterns, sexual relapses, and treatment failure indicate high risk of future sexual reoffense." Pet. Ex. 29 at 1334-1335.

### 3. Dr. John Fabian

55. Dr. Fabian conducted a neuropsychological evaluation of Mr. Hass and he was the only expert among the three who was qualified to do so. He determined through testing that Mr. Hass' current neuropsychological and neurocognitive profile indicate some mild neurocognitive deficits, ultimately resulting in a condition of cognitive disorder not otherwise specified, secondary to his history of a probable moderate traumatic brain injury at age 13. He has full scale IQ in the average range with a score of 98. He discussed Mr. Hass' childhood with his mother, and notes that Mr. Hass likely qualified for attention deficit, hyperactivity disorder as a child and adolescent, but his ADHD condition has diminished to some degree over the years into adulthood. He noted the literature confirms a correlation between ADHD and traumatic brain injury (TBI), i.e., individuals with ADHD often suffer TBI. He concluded that Mr. Hass does not suffer from volitional impairment. He noted that Mr. Hass' two hands-on convictions occurred during adolescence and

15

are properly viewed as tied to his traumatic brain injury and ADHD. Therefore his risk for committing sexual violence has decreased with time as he moves farther from the TBI and as his ADHD has gone into partial remission. Consistent with this view is the fact that for the last 20 years Mr. Hass' sexual deviance is manifested in child pornography offenses only.

56. Dr. Fabian opined based on his examination of Mr. Hass and review of his records that Mr. Hass has demonstrated volitional control over his disorder (pedophilia), and therefore, "When considering this case, it is my opinion with a reasonable psychological and neuropsychological certainty that Mr. Hass has a mental abnormality including pedophilia. He also qualifies for a cognitive disorder not otherwise specified and ADHD condition by history. It is my opinion that his neurocognitive disorders of traumatic brain injury and ADHD, coupled together within a developing brain, placed him at risk for behavioral impairments, impulsivity, and sexual aggression during his adolescent and young adult years. The behavioral, emotional, and neurocognitive effect of these conditions has diminished over time, and do not cause him significant volitional impairments more recently and currently." Resp. Ex. 1 at 58.

57. In assessing Mr. Hass's risk of recidivism, Dr. Fabian used several actuarial instruments, namely the Static-99R, Static-2002R, SVR-20, and PCL-R. Resp. Ex. 1 at 42-52. Dr. Fabian scored Mr. Hass at a seven on the Static-99R which appears to be the most highly validated of the actuarial instruments. When utilizing the instruments's Routine normative sample, scores of 7 within this sample had a probability estimate of reoffending of 18.8% after 5 years. When considering the Preselected for Treatment sample, his score of 7 on the Static-99R indicates a probability estimate of sexual recidivism of 25.4% after 5 years and 33.3% after 10 years. When considering the Non-routine normative sample, his score of 7 on the Static-99R indicates a

16

probability estimate of sexual recidivism of 30.6% after 5 years and 39.7% after 10 years. When considering the High Risk/Need Group, his score of 7 on the Static-99R indicates a probability estimate of sexual recidivism of 37.9% afer 5 years and 48.6% after 10 years. Dr. Fabian further opined that "studies have shown the reasonable predictive validity of actuarial tools for sexual and nonsexual violence amongst a variety of offender samples. However, their ability to generalize to a particular offender is unknown." *Id*. at 42. He further noted that it is unknown to what extent an individual with Mr. Hass's unique history of ADHD and traumatic brain injury is represented in the samples to which he is being compared.

58. Dr. Fabian also utilized the SVR-20 test in rendering his opinion on Mr. Hass's likelihood of recidivism. *Id.* at 42. He noted that Mr. Hass's "offending patterns are unique and may not be well represented in the offender developmental representative samples of the actuarial measures." *Id.* Specially, Mr. Hass's history of traumatic brain injury and peodphilia and his remote contact offense and recent non-contact offenses may not be well represented in these groups." Id.

59. In formulating his opinion regarding Mr. Hass's risk of recidivism, Dr. Fabian took into account the fact that Mr. Hass has gone years in the community without a sexually violent offense towards a child. Resp. Ex. at 58. He also noted that Mr. Hass has demonstrated a de-escalation in sexual offending. Resp. Ex. at 56. In particular, his more recent offenses included nonviolent and non-contact sexual offenses which are possession of child pornography offenses. *Id*. These offenses are closely related to pedophilia but are not considered as sexually violent in nature as his prior hands-on cases. *Id*.

60. The Court credits the testimony of Dr. Fabian who notes that Mr. Hass's pedophilic condition is more associated with his more recent non-contact and non-violent sexual offending, and

17

in Dr. Fabian's opinion does not cause him serious difficulty in refraining from sexually violent conduct or child molestation if released. Resp. Ex. at 58.

## VII. CONCLUSIONS OF LAW

61. The Court finds that respondent has committed acts of child molestation in the past.

62. The Court finds that respondent meets the diagnostic criteria for pedophilia.

63. The Court finds that pedophilia is a chronic disease but does not carry with it any necessary implications regarding level of volitional control. The Court finds that the government has not proven by clear and convincing evidence that respondent suffers from a volitional impairment such that he would have "serious difficulty refraining from sexually violent conduct of child molestation if released."

64. The United States Supreme Court precedent makes clear that the "serious difficulty" language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the person to control his dangerous behavior. *See Kansas v. Crane*, 534 U.S. 407, 411 (2002) (citing *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)). The conflicting evidence concerning the probability of Mr. Hass's reoffending cannot support a finding that he would have "serious difficulty" in refraining from child molestation.

65. The Court has been presented with three opinions about respondent's risk of reoffense in the event he is released. The Court has considered the information and finds this information relevant to its determination of respondent's sexual dangerousness. Having considered the reports, forensic evaluations, and testimony of the three experts in this case, the Court finds that the government has not proven dangerousness by clear and convincing evidence sufficient to justify commitment.

## VIII. CONCLUSION

For the foregoing reasons, the Court should enter judgment in this matter that Johnny Hass is not a "sexually dangerous person" and order his release from the custody of the federal Bureau of Prisons so that he may commence his term of supervised release.

Respectfully submitted this 24th day of January, 2012.

THOMAS P. McNAMARA
Federal Public Defender

*/s/ Debra Carroll Graves*
DEBRA CARROLL GRAVES
Assistant Federal Public Defender
Senior Trial Attorney
E-mail: Debra_Graves@fd.org
N.C. State Bar No. 13513

*/s/ Cindy Bembry*
CINDY BEMBRY
Assistant Federal Public Defender
E-mail: Cindy_Bembry@fd.org
N.C. State Bar No. 41788

Attorneys for Respondent
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
LR 57.1 Counsel, Appointed

*CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that a copy of the foregoing was served upon:

**G. Norman Acker , III**
**R. A. Renfer , Jr.**
U.S. Attorney's Office
310 New Bern Ave.
Suite 800
Raleigh, NC 27601-1461
Email: norman.acker@usdoj.gov
Email: rudy.renfer@usdoj.gov

**Michael D. Bredenberg**
**Michael E. Lockridge**
Federal Medical Center
P. O. Box 1600
Butner, NC 27509
Email: mbredenberg@bop.gov
Email: mlockridge@bop.gov

by electronically filing the foregoing with the Clerk of Court on January 24 2012, using the CM/ECF system which will send notification of such filing to the above.

This the 24th day of January, 2012.

/s/ Debra Carroll Graves
DEBRA CARROLL GRAVES
Assistant Federal Public Defender
Attorney for Respondent
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236; Fax: 919-856-4477
E-mail: Debra_Graves@fd.org
N.C. State Bar No. 13513
LR 57.1 Counsel, Appointed